FILED
03/18/2019
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 1, 2019

**ANGELA CHARLENE IVESON v. JEFFREY WAYNE IVESON**

**Appeal from the Chancery Court for Sumner County**
**No. 2008D-247     Louis W. Oliver, III, Chancellor**

_____

**No. M2018-01031-COA-R3-CV**
_____

This appeal concerns a post-divorce effort to modify a residential parenting schedule. Angela Charlene Iveson ("Mother") filed a petition against ex-husband Jeffrey Wayne Iveson ("Father") in the Chancery Court for Sumner County ("the Trial Court") seeking to modify the permanent parenting plan applicable to their minor daughter ("the Child"). The petition proceeded to a bench trial. Afterward, the Trial Court entered an order reducing and restricting Father's parenting time as well as increasing his child support obligation. Father appeals to this Court, arguing, among other things, that the restrictions placed upon his parenting time are unwarranted and that the Trial Court erred by using his income for the most recent one year rather than a three year average of his income for child support purposes. We find that the Trial Court's decisions with respect to these discretionary issues have a sufficient evidentiary basis and are consistent with applicable law. Thus, the Trial Court did not abuse its discretion. We, therefore, affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KENNY W. ARMSTRONG, J., joined.

Thomas F. Bloom, Nashville, Tennessee, for the appellant, Jeffrey Wayne Iveson.

Laura A. Potteiger, Gallatin, Tennessee, for the appellee, Angela Charlene Iveson.

# OPINION

## Background

Mother and Father divorced in July 2009.  Three minor children were born of the marriage.  Two older boys have since aged out.  Only the status of the Child, born January 2003, remains at issue.  Under the original permanent parenting plan, Father retained custody of the two boys and Mother the Child.

The parties maintained a complicated relationship post divorce.  Father married Sandra Jackson ("Stepmother"), a licensed practical nurse, in August 2011.  For her part, Mother got engaged in 2012, but later ended that relationship.  Things became rocky on Father's side, as well.  At one point, Stepmother filed for divorce from Father.  Mother and Father, although divorced, temporarily renewed their relationship.  Father and Stepmother later reconciled.  In June 2016, Mother filed her petition to modify the parenting plan and child support in the Trial Court.

This matter was tried in January 2018, and we will quote the testimony most pertinent to the issues raised on appeal.  A central point of contention at trial was Mother's position, backed by the Child's testimony, that Stepmother and her daughter ("Stepsister") were negative forces in the Child's life, and that this justified some restriction of Father's parenting time.  Father testified adamantly against that view.  Regarding Father's alleged failure to exercise parenting time, Mother testified:

> Q. So let's fast forward a little bit over those next few years.  At the time of -- when you filed this petition in 2016, what was the status quo at that point with visitation with [the Child]? How often was she going over to --
> A. She wasn't going over there at all.
> Q. Okay.  Now, you swore in your petition that you've estimated about six days of parenting time that he'd exercised in the previous year?
> A. Maybe.
> Q. You think that's being generous?
> A. Yes.  That would probably be like your holidays, if he showed up to get her or came by the house to eat dinner with us.

Testifying as to Stepmother's alleged temper problem, Mother recounted examples of Stepmother's conduct:

> Q. Has [Father] ever told you that [Stepmother] was angry or otherwise distraught with the children?
> A. Yes, he has.  Yes.

Q. How often?

A. Many times. He said -- he would tell me how she wasn't a mother; that she was a friend. She has no control over her daughter. I try to explain to him and show him some of the posts that [Stepsister] would put online to let him know what was going on over there. And he would tell me how he would throw kids out of that house in the middle of the night all the time; that it wasn't appropriate over there.

Q. Do you recall any additional instances that you saw in interactions between [Stepmother] or [Stepsister] and [the Child] that you personally witnessed?

A. Eighth-grade recognition night, we were supposed to go out and be recognized with [the Child].

Q. And what was that?

A. That would have been her eighth-grade year, last football game. She's in ninth grade now. So that was '16. October of '16 or so.

Q. And what was this recognition night?

A. They were -- of course, she was in eighth grade, and she was graduated. She's a cheerleader. So it was to be recognized for being a cheerleader through middle school. And they walk out on the field, and they introduce the kids and the parents. And then, you know, everybody in the stands clap for them. And -- and it's over.

Q. Now, tell us about -- you said that you had seen some kind of interaction between [the Child] and [Stepmother]?

A. Yes. When [the Child] got there -- there was a series of text messages between [Stepmother] and [the Child] the night before about coming to the game. [The Child] asked nicely several times, can it just be my mom and my dad. Because [Stepmother] very rarely would ever be around, you know. She showed up. They all showed up for the night, the game. And when we got there, the principal said it was all [the Child's] decision on what she wanted to do. And she chose not to be recognized that night. She sat to the side. Was very upset because of the fact -- what was going on. And then when it was done, she walked over to her cheer bag to get her pompoms out because they were supposed to get in line. And [Father] and [Stepmother] walked up to the fence at that point, and there was pointing of the fingers, almost down in her face. You could hear that she was yelling. And then they were out of there.

THE COURT: Who was yelling?

THE WITNESS: [Stepmother] was yelling at [the Child], asking her, "What would God do to you?" We go to church. We're religious people. We believe in prayer. And she was pointing fingers and, "What would God do to you for you doing this to your dad?"

-3-

Regarding health insurance for the Child, the basis for another issue on appeal, Mother testified:

Q. You also propose in this proposal that the father maintain health insurance on [the Child], as he was previously ordered to do?
A. Correct.
Q. And you also propose that any uncovered reasonable and necessary medical expenses be paid by the father?
A. Correct.
Q. Okay. Why do you believe that that is reasonable and in [the Child's] best interest?
A. Because when we first got divorced, the way his insurance was, the -- he had, like, an has account, but it's through Blue Cross Blue Shield. The money always sat there. So when they would go to the doctor, it was a high deductible plan, but Nissan would put money into this has-type account. And Blue Cross Blue Shield -- whatever balance wasn't paid, Blue Cross Blue Shield would use that money to pay it. My kids aren't sickly, so we didn't have doctor bills. And then at some point it's changed. I wasn't notified. I was given a new card last year -- April of last year, she broke her finger. And I had picked up insurance on her because I wasn't getting the insurance information from him. And at that point he actually ended up texting my son pictures of the current insurance card and the current prescription card. The insurance has changed, and it leaves huge bills now, using the high deductible they've -- at some point it got shut down to where they are not using -- [Father] is not using this has account where Blue Cross Blue Shield just automatically does it. What happens now is, they have a card that they have. The insureds have a card that they use for any amounts for the insurance -- you know, after the insurance has paid that's supposed to be paid by this card. But I do not have access to that card. I did not find out about that until a phone call -- I called Blue Cross Blue Shield last year to find out what was going on.
Q. So at the time of the divorce --
A. Uh-huh.
Q. -- how many medical bills were you actually paying?
A. Nothing.
Q. And since that time, have you had medical bills on top of what's covered?
A. 2017 was a huge year, yes. Because she had an incident -- a cheer incident that we had to replace some teeth and stuff. So last year, yes. But she's not -- I mean, normally my kid goes to the doctor for her physicals for cheer. She may get a cold once a year. So normally we didn't go to the

-4-

doctor a lot. So the money that was sitting there would always sit there and it would compensate what was left over.

Q. To the best of your knowledge, do the remaining terms in this parenting plan reflect what was in place prior -- what was effectively in place now, in the current parenting plan?

A. Yes.

As to her home situation, Mother testified regarding money she received from a son who moved in with her:

Q. Now, you have someone living with you who's paying rent, aren't they?

A. They are not paying rent, but my son lives with me.

Q. Who's your son?

A. [J.C.].

Q. All right. Does he not pay you $650 a month?

A. No. He pays right at $600 a month, and that's to pay -- he has his -- we have a group cellphone bill. And that's actually under him. But it goes to pay his cellphone bill, it goes to help with groceries, it goes to -- he's got wifi and Internet that we did not have until he moved -- I mean, wifi, Internet, and I think it's U-verse now. That TV -- where he can watch TV. He put that in. But we didn't have any of that before he moved in. And that was, if you want it, then you are going to be financially responsible for it.

Q. All right. And that's $650 a month?

A. Also -- I didn't say -- it was $600 a month he gives me, okay?

Q. $600 a month?

A. Yes.

Q. All right. Now, he gives you that in cash?

A. No, he puts it in my checking account.

Q. Puts it in your checking account.

A. Because my bills automatically come out of --

Q. And then you pay bills out of it?

A. Yes.

The Child testified to her wishes going forward. Regarding her desire not to be around Stepsister, the Child stated as follows:

Q. Okay. Now, you've testified in previous hearings what it is specifically about [Stepsister] that scares you and that makes you not want to be around her?

A. Yes.

Q. That's your stepsister.  And also your [Stepmother].  But this is our final hearing date.  So I'd like to just have you go through and give me some specific reasons -- let's start with [Stepsister] -- that you're asking that you not have to be around [Stepsister].
A. Well, I've, like, seen her, like, get, like, violent.  Or I guess you could say violent.  Just physical, I guess.  In the car, like I said before.  When she, like, jumped over me and hit my brother.  And then I've seen her just go off, like, crazy.  Just over, like, simple things.

The Child's view of Stepmother was similar.  On the subject of why she did not want to be around Stepmother, the Child stated:

Q. Now, tell me a little bit about why you don't want to be around [Stepmother].
A. I've seen her basically do the exact same thing seem.  Like, unstable at different times over, like, simple things.
Q. Okay.  Has she been violent in your presence?
A. Yes.
Q. Okay.  Has she knocked over furniture in your presence?
A. Yes.
Q. Has she been derogatory towards your dad in your presence?
A. Yes.

Father, in stark opposition to the testimony of Mother and the Child, testified passionately that his family had been splintered apart by Mother's vindictiveness.  In his testimony, Father acknowledged that Stepmother was facing certain criminal charges relating to drugs.  Father stated in an exchange with the Chancellor:

THE COURT: Okay.  And just so that I understand, you're insistent upon the fact that [the Child] must be required to spend the night in your -- in your home while your wife, [Stepmother], is there, after you've heard her testimony?
THE WITNESS: Yes, Your Honor, I am.
THE COURT: Okay.
THE WITNESS: I mean, can I speak freely about it?
THE COURT: That's why I'm trying -- I'm trying figure out what to do.
THE WITNESS: My daughter, for the last time, has been living with her mother.  Her mother does have a vindictive case against myself and [Stepmother].  Mainly [Stepmother].  Yes, we did have two affairs, Your Honor.  We did.  She's upset with [Stepmother], even with text and

everything that we could provide -- that she's upset that [Stepmother] didn't leave me; that I decided to stay with [Stepmother].

THE COURT: Well, I understand. But I'm not -- I'm concerned about what your daughter has said to me.

THE WITNESS: Yes, Your Honor. And that's what I'm trying to get at. She's got her mother in her ear 24 hours a day, except for the little times that I do get her. Especially right now, 24 hours a day putting stuff in her head, Your Honor. She's not gotten to get back over with us. My wife has had a restraining order for 17 months. 17 months, Your Honor. I can't even have a family. I can't do -- take all my family to a dinner. That's all my family. My wife has never harmed my daughter, ever. Okay? My stepdaughter has never harmed my daughter. And yet I got pulled into Court on the very first day for irreparable harm to my daughter because I wouldn't let her go on a school trip -- or a trip. And then I got my parental rights stripped from me for 10 weeks, 12 weeks because she wanted to go to a dance. It was my time, and I was going to take her. And my parental rights were stripped. Okay. Yes, my wife has criminal charges against her. But again, the people don't go around talking [sic] daughters and stepdaughters and children away from their parents because they've been accused of something. That's not how it's supposed to work. I can't have a family. And that does make this -- [Mother] very happy because that's what she wants. But my daughter's not had the time to get back into my family and relearn and get acquainted and do things and have fun. My daughter used to love [Stepmother] to death. Love [Stepmother] to death. There was even a time she asked her did she need to call her mom or what. And there were a couple of times she said she wished she was her mom. She loved her. Followed her around the house every time she came to visit. Then we had some incidents between me and [Mother], things got a little tense, then my daughter started backing off. Because I don't know what went on between her and my daughter and what she was saying about [Stepmother]. But again, herself in the text messages and stuff, she heard her say earlier, she told [Stepmother] she's a great woman. Well, if she's a great woman to take care of our child and come help you at 2 o'clock in the morning, why isn't she a great woman now? But again, this has all been taken away from me for nothing. Nobody has harmed my daughter. I would never let anybody harm my daughter. Ever. I wouldn't let anybody harm any of my children. And do I think that's a bad environment? No, I don't, Your Honor. I do not.

In February 2018, the Trial Court entered its order ruling in favor of Mother. The Trial Court found and held, as relevant:

8. The 2010 Permanent Parenting Plan (hereafter "PPP") named the Mother as Primary Residential Parent for [the Child] . . . with the parenting time to be 285 days for Mother and 80 days for Father. The Father was to have parenting time with [the Child] from Friday after school to Sunday at 8:45 p.m. every other week, and every Thursday evening after to school until 8:45 p.m.; two weeks of uninterrupted parenting time in two seven day increments nonconsecutive in the summer, with the first week of parenting time to be the Saturday before July 4 through the following Saturday (due to Father's work schedule at Nissan). Other additional holiday parenting time with [the Child] was awarded to Father.

9. In that Father was the Primary Residential Parent of two older minor children, the Court approved a deviation from the Child Support Guidelines and ordered that neither party shall pay child support to the other. The Father was to maintain reasonable health insurance on the parties' minor children with the Mother to be responsible for all uncovered reasonable and necessary medical expenses for [the Child].

10. The minor child [J.C.] was emancipated on May . . ., 2011. The minor child [Z.W.] was emancipated on August . . ., 2016. Both resided with Father. The remaining minor child [the Child] is now fifteen years of age.

11. The Father works the evening shift at Nissan and typically does not arrive home from work until late night, Monday through Friday. Father does not anticipate a change in his work schedule. Due to his work schedule, Father is precluded from having parenting time with the minor child every Thursday evening and Friday evenings every other weekend as ordered in the PPP.

12. Father married [Stepmother] in 2011. After his marriage to [Stepmother], Father only sporadically exercised his parenting time designated in the PPP with [the Child], Father exercised parenting time approximately six times in 2016.

13. [Stepmother's] daughter [Stepsister] is now eighteen years of age and has been living with Father and [Stepmother] in Father's home. [Stepsister] is a drug addict and has been on and off drugs since the age of thirteen (13). [Stepsister] has undergone attempts of rehabilitation on five (5) occasions and is now to undergo adult rehabilitation in California for one year. [Stepsister] has made Facebook posts demonstrating alcohol possession, guns and smoking. [The Child] has witnessed [Stepsister] being aggressive to other family members in her presence. [The Child] is concerned for her safety around [Stepsister] and does not want to be in [Stepsister's] presence.

-8-

14. [Stepmother] has shown significant aggression in the presence of the minor child on a number of occasions. [Stepmother] was argumentative and aggressive toward other witnesses in the presence of the [the Child] while in court sequestration at the courthouse in June 2016. [Stepmother] lectured the child regarding the unfitness of Mother in September 2016; publicly rebuked [the Child] while at [the Child's] cheerleading recognition event at [the Child's] school and attended the event over the child's objection; angrily threw Christmas presents and other items in the presence of the child; and, [Stepmother] was arrested in May, 2017 on Felony drug charges involving minors at her home. [The Child] has testified to the Court that she does not want to be in the presence of [Stepmother] during parenting time with Father. It is in [the Child's] best interest that parenting time with the Father be conducted outside the presence of [Stepmother] and [Stepsister].

15. [The Child] has testified to the Court that she desires to maintain an ongoing relationship with Father outside the presence of [Stepmother]. Father has testified he wished to maintain an ongoing relationship with [the Child].

16. The Court reviews Tennessee Code Annotated 36-6-106(a)(9)(11)(12)(13) and (14) in consideration of the request by Mother and [the Child] that [the Child] not be in the presence of [Stepmother] and [Stepsister].

17. Factor (9) the Child's interaction and interrelationships with siblings, other relatives and step relatives, and mentors as well as the child's involvement with the child's physical surroundings, school or other significant activities. The Court finds that [Stepmother] and [Stepsister] pose a threat to the child's safety and well being for the reasons stated hereinabove with this factor supporting no contact with [Stepmother] and [Stepsister] as a stepmother and stepsister.

18. Factor (11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The Court shall where appropriate refer any issues of abuse to Juvenile Court for further proceedings.

19. Factor (12) The character and behavior of any other person who resides in or frequents the home of the parent and such persons interactions with the child. For the reasons stated hereinabove, Factors (11) and (12) are applicable and support the fact that [Stepmother] and [Stepsister] should not be in the presence of the minor child due to emotional outbursts of anger, [Stepmother] lecturing the child about the Mother and Mother's conduct, the berating of the child in public at the child's 8th grade recognition (after the child requested [Stepmother] not be present) and the

pending Felony drug charges against [Stepmother] involving juveniles. Further, the emotional outburst and public display by [Stepsister] on social media, as well as [Stepsister's] drug addiction are all sufficient reasons for the minor child [the Child] to not be required to be in the presence of [Stepmother] nor [Stepsister].

20. Factor (13) The reasonable preference of the child at twelve (12) years of age or older. The Court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children. The minor child [the Child], age fifteen, has testified before the Court that she desires not to be in the presence of [Stepmother] or [Stepsister] due to the reasons stated hereinabove. The Court gives significant weight to [the Child's] preference in that such preference is supported by evidence presented other than through [the Child].

21. Factor (14) Each parent's employment schedule, and the Court should make accommodations consistent with those schedules. [The Child] has testified that she desires to maintain a parent/child relationship with Father, notwithstanding her preference to not be around [Stepmother] nor [Stepsister]. Father is employed on the evening shift in a well paying manufacturing job at Nissan for which Father does not anticipate a change in his work schedule. Therefore, the Court will accommodate Father's schedule by eliminating every Thursday evening and every other Friday evening parenting time with [the Child].

22. Mother contends she has expended $1,500.16 on health care bills for [the Child] since 2010. Mother has texted Father on the medical coverage and Father did not respond. Mother could not get information from Father regarding the child's medical insurance coverage. Mother testified that she obtained medical insurance coverage on the minor child due to Father's unresponsiveness.

23. Father contends the child remained covered under his health insurance coverage since the original divorce, and never changed the health insurance coverage. Father sent an insurance card to Mother approximately six to eight months prior to the hearing. The Court finds that there is insufficient evidence the Father did not carry reasonable health insurance coverage on the minor child [the Child] as required in the PPP, however, the insurance may have had a high out of pocket expense.

24. The PPP required Father to carry reasonable health insurance on the parties' three children, the PPP required Mother to pay all uncovered reasonable and necessary medical expenses for the minor child [the Child].

25. The Court requires Father to continue to carry reasonable medical insurance on the minor child [the Child]. All uncovered reasonable

and necessary medical expenses for [the Child] including but not limited to deductibles or co-payments, eye glasses, contact lenses, routine annual physicals and counseling will be paid by the Mother and Father on the prorated basis of the respective gross income of each as determined in the child support worksheet. All uncovered reasonable and necessary medical expenses incurred on the minor child [the Child] for the period up to August . . ., 2016, (the emancipation of [Z.]) date, will be the responsibility of Mother. All uncovered reasonable and necessary medical expenses incurred on and after August . . ., 2016, will be the responsibility of Mother and Father on an income prorated basis as stated hereinabove. Mother will provide copies of all medical bills incurred on [the Child] on and after August . . ., 2016, to Father within thirty (30) days, and Father will have the responsibility to reimburse Mother for those prorated expenses within ninety (90) days. All future uncovered reasonable and necessary health care expenses for [the Child] will be submitted to Father within thirty (30) days of being incurred, and Father will reimburse Mother for those expenses within thirty (30) days. Father will provide to Mother all necessary insurance cards and documentation required to secure medical treatment coverage for [the Child] on Father's health insurance.

26. The Mother is employed at the YMCA full time and Captain Video part time. The Mother's gross monthly income was $3,335.00 for the YMCA and $390.00 for Captain Video. The Mother's total gross monthly income for child support purposes is $3,725.00. The Mother receives $600.00 per month in payment from an adult child for his living expenses which the Court finds is a set off against expenses paid by Mother on behalf of the adult child, and is therefore not counted as gross income to the Mother.

27. The Father is employed as a factory worker at Nissan in Smyrna. Based upon Father's pay stubs for 52 weeks from October 14, 2016, to October 6, 2017, Father's annual gross income is $84,917.86. The Court determines the Father's gross monthly income to be $7,076.00 for child support purposes.

***

31. For the period June 8, 2016, through February, 2018 the Father owed the Mother for child support on [the Child] a total of $16,018.00. For the same time period, the Father paid Mother $8,099.00, leaving a child support arrearage balance of $7,919.00 as of March 1, 2018. The arrearage balance of $7,919.00 should be satisfied over a period of 27 months at the rate of $293.00 per month. The current child support obligation of $824.00

-11-

per month plus the child support arrearage of $293.00 per month is a total payment of current child support and arrearage of $1,117.00 per month beginning March 1, 2018, and with the arrearage payment ending in May, 2020. The monthly child support payment may be prorated to conform to Father's work pay schedule.

32. The Court finds a material change in circumstances has occurred in accordance with T.C.A. 36-6-101(a)(2)(C) which warrants a modification of the residential parenting schedule. The material change in circumstances is based upon the child's increase in age to fifteen (15) years old (the child being age seven at the time of the most recent PPP); the change in Father's work schedule; the change in the Father's living conditions with the addition of wife [Stepmother] and [Stepsister], and such other circumstances cited hereinabove, which make it necessary to make changes in the residential parenting schedule and matters related thereto.

33. Based upon the Father's work schedule and the evidence presented to the Court, the Court finds that the Father will have parenting time with the minor child every other weekend from Saturday morning at 9:00 a.m. until Sunday night at 6:00 p.m. This overnight parenting time must be conducted outside the presence of [Stepmother] and [Stepsister] and they may not be on the premise of the visitation at any time during the visitation time period. . . .

\*\*\*

35. Based upon the parenting time allocated to Father, Mother is allocated 321 parenting days and Father is allocated 44 parenting days.

36. Mother's attorney fees may be awarded based upon an affidavit submitted with a separate order.

In March 2018, Father filed a motion to alter or amend. In April 2018, Mother filed a motion to include specific provisions in the final order. In May 2018, the Trial Court entered its order disposing of the motions, an order we quote from as pertinent to those issues raised on appeal:

1. [Father] requests the Court to amend its judgment to allow [Father's] wife [Stepmother] to be present during the father's visitation. The motion included as an attachment a copy of the order portion of the General Sessions Criminal Warrant for possession of schedule IV for resale (Xanax) issued against [Stepmother]. The statement on the Warrant indicated that the criminal charge was under advisement (U/A) for ninety (90) days with [Stepmother] to pay costs and taxes. The Bench Notes and

-12-

Interlocutory Orders section of the Warrant stated, "will be dismissed 6/6/18 U/A (under advisement) until 6/6/18, pay cost only." The Order was signed by Special Judge Randy Lucas.

This Court in its Order of February 16, 2018, cited several specific reasons for the Order banning [Father's] current wife [Stepmother] from being present during parenting time between the father and the minor child. The pending criminal charges were but one of the factors considered by the Court. The Court also considers that the criminal drug case was taken under advisement for a period, and [Stepmother] was not determined to be innocent. The Court also considers the testimony in a prior hearing on December 19, 2017, of the Hendersonville Police Department Detective Richard Steffy regarding the circumstances which occurred and his observations at the time of the initial arrest. Therefore, the Court respectfully denies that portion of the Motion to Alter and Amend.

[2] The Respondent/Father requests the Court to recalculate his child support obligation based upon averaging his annual income over a three year period contending his 2017 income was unusually high because of the amount of overtime he worked that year. [Father] attached to his Motion to Alter and Amend Judgment copies of his 2015 Federal Income Tax Return showing income through wages of $66,801.00 (with total income of $70,803.00) and his Federal Income Tax Return for 2016 indicating gross wages in the amount of $69,367.00. Neither of [Father's] tax returns included a W-2 wage and tax statement showing [Father's] Medicare Wages and Tips for the respective years, which would have been greater. Neither of the prior year's tax returns were introduced at the trial of this matter. The Court finds that [Father's] Federal Income Tax Returns for 2015 and 2016 would have been available to him at the trial of this matter on January 10, 2018. The respective tax returns cannot be considered newly discovered evidence nor can it be considered evidence unavailable to [Father] at time of trial. The Respondent does not contend the income information for the period of October 14, 2016, through October 6, 2017, was inaccurate, but contends the gross income must be compared against prior years that were not placed into evidence at the time of trial.

***

The motion must be denied in that the tax returns were available to [Father] at time of trial, and further [Father] knew that determination of child support was at issue. [Mother] offered proof of [Father's] income through payroll records from October, 2016 to October, 2017. [Father] offered no countervailing proof on his income at trial.

-13-

Further, had [Father's] tax returns for 2015 and 2016 been admitted and considered at trial, the Court would have most likely set [Father's] gross monthly income at $7,076.00. Based upon the income tax returns, [Father] had a wage income of $66,801.00 in 2015 and a wage income of $69,367.00 in 2016. [Father's] income records from October 2016 to October 2017 which were utilized by the Court indicated [Father's] income was $84,918.00 annually.

\*\*\*

In the instant case, [Father's] income went from $66,801.00 in 2015, to $69,367.00 in 2016 to $84,918.00 for most of 2017 (12 months). [Father's] income was steadily increasing, and therefore the Court made the proper determination of his gross income in setting child support.

3. [Father] contends that $600.00 per month received by [Mother] from their adult son who lives with [Mother] should be included in wife's gross income for child support calculations purposes. [Mother] testified at trial that the parties' adult son who lives with her provides her with $600.00 per month for his expenses from which she pays the adult son's cell phone expense, his wi-fi and Internet service, and his food and groceries. [Mother] contended that this was a pass through amount which would not be incurred except for the residency of the adult son and all was spent on providing him food and services. [Mother] did not offer a detailed break down of each item provided to the adult son, however, the Court determined the [Mother] had been credible throughout the trial and accepted the [Mother's] explanation that the $600.00 per month is a "pass through" and that [Mother] incurs the full additional expense for the additional services provided to the adult son which she would not otherwise incur.

Therefore, the Court having addressed each of the three parts of [Father's] motion, the Court must now respectfully deny in full [Father's] Motion to Alter and Amend the judgment.

As a final matter below, the Trial Court entered an order awarding Mother $6,823.47 in attorney's fees. Father timely appealed to this Court.

-14-

**Discussion**

Although not stated exactly as such, Father raises the following four issues on appeal: 1) whether the Trial Court erred in reducing Father's parenting days from 80 to 44 and in ordering Father to exclude Stepmother and Stepsister from his parenting time with the Child; 2) whether the Trial Court erred in failing to include Mother's rental income in the child support calculation and in failing to calculate Father's child support arrearage on the basis of a three year average to account for variations in overtime; 3) whether the Trial Court erred in requiring Father to pay a pro rata share of reasonable uncovered medical expenses; and, 4) whether the Trial Court erred in awarding Mother attorney's fees. Mother does not raise a separate issue requesting her attorney's fees incurred on appeal but instead asks for such only in the argument section of her brief.

We first address whether the Trial Court erred in reducing Father's parenting days from 80 to 44 and in ordering Father to exclude Stepmother and Stepsister from his parenting time with the Child. Father argues that the reduction was punitive and unwarranted.

As to the analysis to be employed when considering a petition to change a residential parenting schedule, this Court has stated:

> [W]hen a court is considering a petition to modify a residential parenting schedule, it must first determine whether a material change of circumstance has occurred. Tenn. Code Ann. § 36-6-101(a)(1)(C). If such a change is established, the court proceeds to determine whether modification of the schedule is in the best interest of the child, utilizing the factors at § 36-6-106(a) and, where applicable, § 36-6-406.

*Wheeler v. Wheeler*, No. M2015-00377-COA-R3-CV, 2016 WL 3095695, at *3 (Tenn. Ct. App. May 24, 2016), *no appl. perm. appeal filed*. The abuse of discretion standard is applied when reviewing a trial court's modification of a residential parenting schedule. *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013). An abuse of discretion occurs when a trial court "appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Id*. (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)). The material change necessary to trigger a change in the residential parenting schedule includes "changes that reasonably could have been anticipated when the original residential parenting schedule was established." *Armbrister*, 414 S.W.3d at 703 (footnote omitted). Here, the schedule was implemented when the Child was 7 years old, and it is undisputed that it is not working. The parties

very much dispute, however, what sort of modified schedule would be in the Child's best interest. Father requested 90 days with the Child. The Trial Court awarded only 44.

With regard to a child's best interest in the context of a change in residential parenting schedule, the following statutory factors are to be considered by courts:

(a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106 (a)(2017).

The Trial Court made detailed findings relying upon factors (9), (11), (12), (13), and (14). The evidence does not preponderate against the Trial Court's findings. Father argues on appeal that, in sharply reducing his parenting time, the Trial Court wrongly is punishing him for his past failure to fully exercise visitation. Based on our review of this record, Father's interpretation of the Trial Court's rationale is unfounded. Father's past failure to exercise parenting time is but one foundation piece of the Trial Court's judgment.

While Father correctly points out our General Assembly's intent that both parents should enjoy maximum participation in their children's lives, for this to occur it must be consistent with the other relevant best interest factors. The Trial Court made detailed findings in support of its best interest analysis. The Child's preference rightly was afforded considerable weight by the Trial Court. The Child articulated rational reasons stemming from Stepmother's and Stepsister's behavior as to why she prefers not to be around them.

Father, meanwhile, is adamant that his current family should be unified no matter what the Child's views are. Father argues that the Child should not be able to dictate his family situation. In Father's view, he has a right to build his family as he sees fit and the Trial Court, by excluding Stepmother and Stepsister from his parenting time, wrongly makes him choose between his relationship with the Child and his relationship with Stepmother and Stepsister. Father cites an opinion of this Court in which we stated:

> Unless "substantial harm threatens a child's welfare, the state lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit." *Hawk*, 855 S.W.2d at 577. In cases of divorce, it is very important to maintain the relationship between the non-custodial natural parent and the child, *Neely v. Neely*, 737 S.W.2d 539, 542 (Tenn. Ct. App. 1987) (citing *Dillow v. Dillow*, 575 S.W.2d 289, 291 (Tenn. Ct. App. 1978)), and "[t]he courts should not lightly and without good cause sever the non-custodial parent's right to the care and companionship of a child." *Neely*, 737 S.W.2d at 542 (citing *Stubblefield v. State ex rel. Fjelstad*, 106 S.W.2d 558, 560 (Tenn. 1937)). Because the restraint imposed by the permanent injunction would likely

-18-

interfere with Mr. Motycka's right to maintain a relationship with his children, Mr. Motycka has standing to challenge the validity of the injunction issued in this action.

*Atkins v. Motycka*, No. M2007-02260-COA-R3-CV, 2008 WL 4831314, at *5 (Tenn. Ct. App. Nov. 6, 2008), *no appl. perm. appeal filed*.

In the instant case, the Trial Court found specifically that [Stepmother] and [Stepsister] "pose a threat to the child's safety and well being. . . ." The Trial Court cited numerous examples as to the nature of this threat, including Stepsister's unfortunate drug dependency for which she has been in rehab and Stepmother's combustible temper. Father asserts that labeling this a "threat" is an exaggeration. We respectfully disagree with Father and find, as did the Trial Court, that long-term illegal drug consumption and out-of-control temper constitute a substantial threat to the Child's welfare justifying the restrictive provisions in the parenting plan. Father's wish not to have to choose between members of his family is understandable, but it must give way to what is in the best interest of the Child. We affirm the Trial Court both as to its fashioning of the residential parenting schedule and to its exclusion of Stepmother and Stepsister from Father's parenting time.

Moving to the financial issues on appeal, we next address whether the Trial Court erred in failing to include Mother's alleged rental income in the child support calculation and in failing to calculate Father's child support arrearage on the basis of a three year average to account for variations in overtime. According to Father, recent overtime inflated his income and the Trial Court should have averaged the most recent three years of his income instead of using only the most recent year. The standard of review in a child support modification case has been articulated by this Court has follows:

> In a child support modification case, the trial court's findings of fact are reviewed *de novo* with a presumption of correctness. *See Lacey v. Lacey*, No. W2002-02813-COA-R3-CV, 2003 WL 23206069, at *2 (Tenn. Ct. App. Oct. 31, 2003), *no perm. app.* (citing *Huntley v. Huntley*, 61 S.W.3d 329, 334 (Tenn. Ct. App. 2001)). On appeal, considerable deference is given to the trial court's determinations of the credibility and weight to be given to witness testimony because "the trial court [had] the opportunity to observe the witnesses' demeanor and hear the in-court testimony." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 678 (Tenn. 2007) (citing *Tobitt v. Bridgestone/Firestone, Inc.*, 59 S.W.3d 57, 61 (Tenn. 2001); *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. Workers Comp. Panel 1995)). "The trial court's conclusions of

-19-

law are reviewed *de novo*, with no presumption of correctness." *Lacey*, 2003 WL 23206069, at *2 (citing *Huntley*, 61 S.W.3d at 334).

*Massey v. Casals*, 315 S.W.3d 788, 793-94 (Tenn. Ct. App. 2009). Child support decisions retain certain discretion but this discretion is hemmed in by the Child Support Guidelines. *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). "Averaging is usually correct for calculating a party's fluctuating income, but it is not appropriate when a spouse's income is steadily declining or increasing . . . . In such circumstances, the obligor's income should be based on his or her current salary." *Cisneros v. Cisneros*, No. M2013-00213-COA-R3-CV, 2015 WL 7720274, at *6 (Tenn. Ct. App. Nov. 25, 2015), *no appl. perm. appeal filed* (citations and internal quotation marks omitted).

In its order denying Father's motion to alter or amend, the Trial Court noted that Father had failed to present this additional evidence of income at trial even though it was available at the time of trial. The Trial Court stated that, even if it had considered the additional evidence, if would have found as it did because Father's income was increasing. Father fails to cite sufficient authority reflecting that the Trial Court somehow was obliged to use an averaging method in these circumstances to determine his income. Averaging is appropriate in many instances, but it is not required in all.

With respect to Mother receiving $600 per month from her adult son and whether that should be included as rent in her gross income for child support purposes, the Trial Court found that this practice was a mere "pass through." In making its finding, the Trial Court found Mother a credible witness and accepted her explanation. We extend significant deference to trial court's credibility determinations. We affirm the Trial Court on this issue pertaining to the parties' respective incomes.

We next address whether the Trial Court erred in requiring Father to pay a pro rata share of reasonable uncovered medical expenses. Father states that no material change of circumstance occurred since entry of the original permanent parenting plan to justify placing this new burden on him. Father cites one case, *Blake v. Sims*, No. W2007-02129-COA-R3-CV, 2008 WL 5130425 (Tenn. Ct. App. Dec. 5, 2008), *no appl. perm. appeal filed*, for the uncontroversial proposition that a change in custody or visitation requires a material change in circumstances.

We do not see how this relates to any alleged error by the Trial Court. The Trial Court found, as we have affirmed, a material change in circumstances for purposes of the residential parenting schedule. The Trial Court also revisited child support, and Father does not dispute that he must pay child support for the Child although he disputes the calculation of his income. Therefore, it is strange that Father would contend that this

specific expense requires a material change in circumstance as to the insurance coverage itself akin to that required to modify the residential parenting schedule. Certainly he has cited no authority to that effect. In any event, even if that were the case, it is not quite as simple as Father's statement that his health plan has never changed. Mother testified at trial that, in recent times, she has incurred large costs because Father's health plan leaves so much uncovered. It may be the same insurance, but practically things have changed to Mother's and, more crucially, the Child's detriment. In our judgment, the Trial Court did not abuse its discretion in requiring Father to pay a pro rata share of the Child's reasonable uncovered medical expenses.

The final issue of Father's we address is whether the Trial Court erred in awarding Mother attorney's fees. At the time Mother's petition was filed, Tenn. Code Ann. § 36-5-103(c) stated as follows:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Tenn. Code Ann. § 36-5-103(c) (2017).

Mother prevailed below and now on appeal. Father argues nevertheless:

> Mother's *bona fides* in commencing this action are subject to doubt based upon the timing of the filing of this action, the draconian restriction sought on Father's parenting rights, the unsuccessful romantic liaisons between the Mother and Father and her dashed expectations immediately preceding the filing, and the paucity of evidence supporting the "no contact" request, militates against the award of attorneys fees, or at least a significant reduction in the amount awarded.

We disagree with Father's characterization of Mother's case. While no party in this case may be completely without fault, Mother succeeded in this litigation. Under the statute, the Trial Court had the discretion to award her attorney's fees as it did. We find no abuse of discretion in the Trial Court's decision to award Mother her attorney's fees.

-21-

Lastly, Mother requests that she be awarded her attorney's fees incurred on appeal. Mother did not identify a request for attorney's fees incurred on appeal as a distinct issue. The Tennessee Rules of Appellate Procedure provide:

> b) Brief of the Appellee. The brief of appellee and all other parties shall conform to the foregoing requirements, except that items (3), (4) [a statement of the issues presented for review], (5) (6) and 7(B) of subdivision (a) of this rule need not be included except to the extent that the presentation by the appellant is deemed unsatisfactory. If appellee is also requesting relief from the judgment, the brief of the appellee shall contain the issues and arguments involved in his request for relief as well as the answer to the brief of appellant.

Tenn. R. App. P. 27(b). Mother clearly wished to a raise a separate issue but did not identify it as such in her statement of issues presented for review. "Courts have consistently held that issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4). An issue not included is not properly before the Court of Appeals." *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001). Exercising our discretion, we decline to award Mother her attorney's fees incurred on appeal. The judgment of the Trial Court is affirmed in its entirety.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Jeffrey Wayne Iveson, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-22-